OPINION
{¶ 1} This is an appeal by defendant-appellant, Jason L. Hayes, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas, following a jury trial in which the jury returned verdicts finding appellant guilty of murder, aggravated robbery and kidnapping. *Page 2 
 {¶ 2} On November 23, 2004, appellant was indicted on one count of murder, in violation of R.C. 2903.02, one count of aggravated robbery, in violation of R.C. 2911.01, one count of kidnapping, in violation of R.C. 2905.01, and one count of having a weapon while under disability, in violation of R.C. 2923.13. The first three counts carried a firearm specification. The indictment arose out of the shooting death of Zane Wilson, the owner of Zane's Gun Rack, on February 27, 2004.
 {¶ 3} On the afternoon of February 27, 2004, Mark Ingham, who had stopped at Zane's Gun Rack to shop for some items, entered the store and discovered a white male lying on the floor. The man appeared to be dead, and Ingham immediately left the store, drove to a nearby police substation and spoke with Columbus Police Officer Earl Westfall.
 {¶ 4} Officer Westfall and other officers went to Zane's Gun Rack, where they found the body of Zane Wilson, age 78. Wilson had been shot, and Officer Westfall could not detect any pulse from the victim. The victim had duct tape on his mouth, and he was holding a .45 caliber "Colt Commander" in his right hand. A .45 caliber shell casing was found near the body. Police officers discovered a .380 caliber shell casing behind a counter, and another .380 caliber shell casing was found inside the front door of the store.
 {¶ 5} According to Zane's son, Roc Wilson, his father routinely carried a Colt Commander in his waistband for security purposes while working in the store. The store contained numerous weapons, collectible items, and military memorabilia. Among the military items Zane Wilson sold were "MRE" bags, containing military prepackaged meals. (Tr. Vol. II, at 218.)
 {¶ 6} Patrick Fardal, the chief forensic pathologist and deputy coroner for Franklin County, conducted an autopsy on the victim, who suffered a gunshot wound to his left *Page 3 
chest. Fardal opined that the cause of death was the gunshot wound, causing injuries to the heart and liver, and he further opined that the victim bled to death approximately 10 to 20 minutes after sustaining the wound. During the autopsy, Fardal recovered a bullet projectile from Wilson's body.
 {¶ 7} On the same date that police officers were dispatched to Zane's Gun Rack (February 27, 2004), Columbus Police Detective Gregory Sheppard received a report of a drive-by shooting at 1920 Genessee Avenue. Appellant and Clifford Morefield resided at that location. Detective Sheppard spoke with Morefield at Riverside Methodist Hospital, where Morefield was being treated for a gunshot wound to the back. According to Detective Sheppard, the information he received from Morefield regarding a drive-by shooting did not make sense.
 {¶ 8} Columbus police officers subsequently obtained a search warrant for 1920 Genessee Avenue. On February 29, 2004, police officers were conducting surveillance when they observed Morefield arrive at the residence. SWAT officers were dispatched to the scene, and officers entered the residence and detained Morefield and two other individuals, appellant and Aaron Hayes. Following a search of the residence, officers recovered shell casings, drugs, cash, an "MRE" bag, and a Lorcin .380 caliber handgun with a magazine clip. Later that day, police detectives interviewed appellant at police headquarters.
 {¶ 9} Police officers also conducted surveillance of 2271 Webster Canyon. A SWAT team entered that residence and detained Jamel Curtis. Officers conducted a search and recovered four weapons underneath a couch; some of these weapons were *Page 4 
"collector guns" that appeared to have been obtained from Zane's Gun Rack. (Tr. Vol. II, at 189.)
 {¶ 10} Another warrant was executed for an address at 2279 Holt Avenue, where Robert Oliver resided. While canvassing the area, police officers seized a black Chevy Celebrity, believed by officers to be the vehicle used in the robbery of Zane's Gun Rack. In the back seat of the vehicle, officers observed blood stains on a seat cushion.
 {¶ 11} The officers also went to 1986 Aberdeen Avenue, the residence of Ramone Jones, acting on information that some of the weapons stolen from the gun shop were at that location. Aberdeen Avenue is located two streets north of Genessee Avenue. In a nearby alley, on Denune Avenue, the officers found four rifles, wrapped in blankets and sheets, that had been placed in a large trash dumpster.
 {¶ 12} Police detectives subsequently gave Roc Wilson the serial numbers of eight weapons. Utilizing a federal bookkeeping system, Wilson determined that each of the serial numbers provided by detectives matched weapons taken from Zane's Gun Rack.
 {¶ 13} Regina Oliver-Wilson (hereafter "Regina") is the sister of Robert Oliver. Regina is acquainted with appellant because appellant and Oliver are friends. Regina is also acquainted with appellant's cousin, Morefield.
 {¶ 14} On February 27, 2004, at approximately 3:30 p.m., Regina and a friend, "Tia," were at a store near Parkwood and Genessee, when Regina saw appellant, Robert Oliver and Jamel Curtis. Later, at her mother's residence at 2279 Holt Avenue, Regina met up with appellant, Oliver and Curtis. Regina then rode with appellant, Oliver and Curtis to Genessee Avenue, but police officers were in the area, so they went back to Holt Avenue. *Page 5 
 {¶ 15} They later returned to Genessee Avenue and entered the residence, remaining there for approximately 20 to 25 minutes. Regina was sitting in the living room during this time, while appellant, Curtis and Oliver went downstairs in the basement. She then observed appellant and Curtis come upstairs with bags in their hands. Regina described the two bags the men were carrying, one of the bags being "a small one," and the other "like a travel size one, duffel bag, kind of large." (Tr. Vol. III, at 385.) Appellant and Curtis took the bags outside, and Oliver also went outside with them.
 {¶ 16} About 20 minutes later, appellant asked Regina to drive him to his sister's house on Webster Canyon. At the time, appellant's sister lived with Curtis. Regina's friend Tia drove a separate car, with Oliver and Curtis riding in Tia's vehicle. On their way, appellant asked Regina to stop at Denune Avenue, or an alley at Denune Avenue, near where Ramone Jones lived. At that location, appellant, Oliver, Curtis and Jones had a discussion, and someone took a bag out of the trunk of Regina's car.
 {¶ 17} Regina then drove appellant to his sister's house at Webster Canyon. Oliver, Curtis and appellant went inside the house carrying bags. Regina went inside to use the restroom, and she observed, on a table, "quite a bit" of guns in the bags. (Tr. Vol. III, at 368.) Regina asked them where they obtained the weapons, but appellant gave her "a stare why was I asking, you know, why was I inquiring about it." (Tr. Vol. III, at 369.) She did not ask any further questions about the weapons based upon "instinct." (Tr. Vol. III, at 372.)
 {¶ 18} During the state's case-in-chief, the prosecution played a videotape recording of an interview conducted by Columbus Police Detectives Christopher Rond and David Harrington with appellant on February 29, 2004. Appellant answered some *Page 6 
initial questions about items found by police officers at the Genessee Avenue residence. When asked by detectives whether he had ever seen his roommate, Morefield, in possession of a .22 caliber handgun, appellant responded, "[m]an, it's so easy to get guns[,] * * * [t]here be so many guns, man." When asked how many guns were presently in the house, he stated, "[j]ust probably that Taurus, that I know of. That Taurus, unless he got some hid somewhere, you know what I'm sayin."
 {¶ 19} Appellant initially told the detectives he was with Robert Oliver's sister at the time Morefield was shot. When asked whether he was aware of a shooting incident at a gun shop in Clintonville, appellant responded that he had seen something on the news about a shooting.
 {¶ 20} Later, during the interview, appellant told the detectives that an individual he referred to as "Eight" had shot the man in the gun shop. When asked how he knew who the shooter was, appellant responded that "the dude told me everything, man." Appellant then told the detectives he rode in a black Celebrity to the gun shop with "Eight" and two other men, Oliver and Morefield. Oliver initially picked him up, and "we like kickin' it." As they were driving toward the gun shop, they told him "they about to rob the dude" at Zane's Gun Rack. According to appellant, he told them "you can drop me off back at the crib." Appellant did not get out of the car, however, because "we was already like right around the corner," and he "didn't want to foot it all that way." Appellant stated he was sitting in the front passenger seat, while Oliver was driving. "Eight" was seated behind Oliver, and Morefield was seated behind appellant.
 {¶ 21} According to appellant, "Eight" got out of the car and went into the store with Morefield. Appellant told the detectives he was sitting in the car when "Eight" shot *Page 7 
the man. After approximately 30 minutes, they returned to the car with guns, and Morefield announced he had been shot. The men returned to appellant's house and dropped off Morefield. Oliver then drove to Regina's house.
 {¶ 22} During the interview with the detectives, appellant offered that he hid a .380 weapon, "[c]ause I was about to turn Eight in, you know what I'm saying cause I stole the gun. That's the gun he used." According to appellant, he was "about to turn him in for the money."
 {¶ 23} Columbus Police Detective David Harrington testified that a gun was found in a china cabinet at appellant's residence. Detective Harrington stated that, during the interview, appellant did not mention traveling with Oliver or Curtis to Ramone's house or to the residence at Webster Canyon. Following the interview with the detectives, appellant told Detective Harrington that Jamel Curtis was the individual he had referred to as "Eight."
 {¶ 24} At trial, the parties stipulated that a latent fingerprint lift taken from the front door of Zane's Gun Rack was identified as matching the fingerprints of Morefield. It was also stipulated that a blood stain on a seat cushion matched DNA types obtained from Morefield. Further, test bullets fired from the .380 Lorcin matched the bullet fragment recovered from the body of the victim.
 {¶ 25} Following the presentation of evidence, the trial court's jury instructions included a complicity instruction. The jury returned verdicts finding appellant guilty of murder, aggravated robbery and kidnapping. The charge of having a weapon under disability was tried separately by the trial court, and the court made a finding of guilty. The trial court sentenced appellant by entry filed March 8, 2006. *Page 8 
 {¶ 26} On appeal, appellant sets forth the following two assignments of error for this court's review:
 ASSIGNMENT OF ERROR NO. 1
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION.
 ASSIGNMENT OF ERROR NO. 2
 THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S MOTION FOR A MISTRIAL UPON THE GROUNDS OF JUROR MISCONDUCT.
 {¶ 27} Under his first assignment of error, appellant asserts that the evidence presented by the state was insufficient to support his convictions. More specifically, appellant maintains there was no evidence of a prior scheme or plan to commit a robbery, and that there was a lack of evidence as to his role in the crime.
 {¶ 28} We initially note that, although appellant's assignment of error appears to be limited to a challenge of the sufficiency of the evidence, appellant also contends, at one point in his appellate brief, that the jury lost its way, thus suggesting he is also raising a manifest weight argument. As noted by this court in State v.Sexton, Franklin App. No. 01AP-398, 2002-Ohio-3617, at ¶ 30-31, the concepts of sufficiency and weight of the evidence are distinct:
 To reverse a conviction because of insufficient evidence, we must determine as a matter of law, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could not have found the essential elements of the crime proven beyond a reasonable doubt. * * * Sufficiency is a test of adequacy, a question of law. * * * We will not disturb a jury's verdict unless we find that reasonable minds could not reach the conclusion the jury reached as the trier of fact. * * * *Page 9 
We will neither resolve evidentiary conflicts in the defendant's favor nor substitute our assessment of the credibility of the witnesses for the assessment made by the jury. * * * A conviction based upon legally insufficient evidence amounts to a denial of due process * * * and if we sustain appellant's insufficient evidence claim, the state will be barred from retrying appellant. * * *
 A manifest weight argument, by contrast, requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. * * * Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. * * * Nonetheless, we must review the entire record. With caution and deference to the role of the trier of fact, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury, as the trier of facts, clearly lost its way, thereby creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * *
(Citations omitted.)
 {¶ 29} The elements of felony murder are set forth under R.C.2903.02(B). Those elements are: "(1) cause; (2) the death of another; (3) as a proximate result of the offender's committing or attempting to commit; and (4) an offense of violence that is a felony of the first or second degree and that is not a violation of R.C. 2903.03 (voluntary manslaughter) or R.C. 2903.04 (involuntary manslaughter)."Sexton, supra, at ¶ 38.
 {¶ 30} R.C. 2911.01(A) defines the offense of aggravated robbery as follows:
 No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing *Page 10 
immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
 (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
 (3) Inflict, or attempt to inflict, serious physical harm on another.
 {¶ 31} For purposes of the instant case, R.C. 2905.01(A)(2) sets forth the elements of kidnapping, and states in relevant part: "No person, by force, threat, or deception * * * shall * * * restrain the liberty of the other person * * * [t]o facilitate the commission of any felony or flight thereafter."
 {¶ 32} The jury in this case was instructed concerning complicity, pursuant to R.C. 2923.03(A), and that statute provides in pertinent part:
 No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 * * *
 (2) Aid or abet another in committing the offense;
 (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code.
 {¶ 33} Under Ohio law, "[participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." State v. Pruett (1971), 28 Ohio App.2d 29, 34. Aiding and abetting may "also be established by overt acts of assistance such as serving as a lookout." State v. Reese (May 19, 2000), Hamilton App. No. C-990682. Under Ohio law, "[b]oth direct and circumstantial evidence *Page 11 
may be introduced to establish the aiding and abetting elements of complicity." State v. Ranson, Franklin App. No. 01AP-1049, 2002-Ohio-2398, at ¶ 30. Further, because the intent of an accused "`dwells in his mind * * * it can never be proved by the direct testimony of a third person, and it need not be.'" Id., at ¶ 31, quotingIn re Washington (1998), 81 Ohio St.3d 337, 340. Rather, such intent "`must be gathered from the surrounding facts and circumstances.'" Id.
 {¶ 34} In the present case, by appellant's own admission, he was present when the robbery and shooting occurred. Despite appellant's denial of any prior knowledge of criminal plans, he acknowledged being made aware of a plan to rob the gun shop while traveling with his companions to that location, and he made no effort to distance himself from them at that time. Instead, appellant remained at the scene for approximately 30 minutes, and he left with the others in the getaway car after the shooting, riding in the front passenger seat. Appellant was also aware that his roommate possessed a .22 caliber Taurus, as well as other guns which, he acknowledged, were "easy to get." Based upon evidence of appellant's presence, companionship and conduct both before the incident and after, including subsequent events discussed more fully, infra, the jury was not required to find credible his attempt to portray himself as an unwitting bystander. Rather, the jury could have reasonably believed that appellant was a willing participant in the plan to rob the gun shop, and that he was fully aware his companions were armed and that harm was a probable consequence of the planned robbery.
 {¶ 35} This court previously has held that a criminal defendant's intent to aid and abet in attempting to cause physical harm to another, to possess a deadly weapon, or to inflict or attempt to inflict physical harm on another, "began at the moment appellant *Page 12 
chose to run away from the crime scene with his accomplices."Ranson, supra, at ¶ 32. This court further held, in Ranson, that the appellant's complicity "continued when he chose to enter the getaway vehicle and ride in the passenger's seat of the van with his accomplices in an attempt to elude the police." Id.
 {¶ 36} In the instant case, in addition to evidence of appellant's knowledge that a robbery was planned and his voluntary presence at the scene for approximately 30 minutes, including facts giving rise to an inference supporting the state's theory that, at minimum, he aided in the crime as a lookout, there was evidence regarding appellant's conduct after the shooting, including his failure to disassociate himself from the crime, by which a jury could reasonably infer a willingness to assent to and aid in its commission. After dropping off the wounded Morefield at appellant's residence on Genessee Avenue, the state presented evidence that appellant, along with Curtis and Oliver, returned a short time later to Genessee Avenue after emergency personnel took Morefield to the hospital. Further, based upon the testimony of Regina, there was evidence that appellant and his companions took stolen weapons from appellant's residence and drove to various locations in an attempt to hide them; those activities included stopping at an alley on Denune Avenue and placing rifles in a dumpster, and driving to appellant's sister's residence, at Webster Canyon, where officers later discovered four antique handguns under a couch.
 {¶ 37} The state also presented evidence that the weapon used in the shooting was recovered at the residence appellant shared with Morefield, along with an "MRE" packet, similar to packets sold at the gun shop. During his interview with detectives, appellant eventually acknowledged being aware of where the murder weapon was *Page 13 
hidden. When given the opportunity to explain to detectives his knowledge of the events, appellant's account was inconsistent and, at times, incredible. Appellant initially told the detectives he learned of the shooting on the news. Only after detectives revealed certain facts, and indicated they would be talking with others who had participated in the incident, did appellant reveal that he was with Oliver, Morefield and "Eight." Near the end of the interview with detectives, appellant, who had earlier told detectives that the only weapon in the Genessee Avenue residence was "probably that [.22 caliber] Taurus," offered that he had hidden the .380 Lorcin, the weapon used to shoot the victim, because he was "about to turn him [Eight] in for the money."
 {¶ 38} This is not a case in which the only evidence before the jury was appellant's mere presence at the scene of a crime. Rather, contrary to appellant's claims to detectives of being an innocent bystander, the evidence indicated that he continued to associate with the perpetrators following the crime, actively assisting them in disposing of stolen items. In construing the evidence most strongly in favor of the prosecution, as we are required to do when considering a sufficiency challenge, including the reasonable inferences to be drawn, the evidence presented was sufficient to permit a reasonable jury to conclude, beyond a reasonable doubt, that appellant acted with complicity to commit the crimes charged. Accordingly, we reject appellant's contention that the evidence was insufficient to support the verdicts.
 {¶ 39} Further, to the extent appellant may be raising a manifest weight challenge, we conclude, based upon a review of the record, that the trier of fact did not lose its way and create a manifest miscarriage of justice. Thus, the jury's verdicts are not against the manifest weight of the evidence. *Page 14 
 {¶ 40} Based upon the foregoing, appellant's first assignment of error is without merit and is overruled.
 {¶ 41} Under the second assignment of error, appellant asserts that the trial court abused its discretion in denying his motion for a mistrial. Appellant argues that the record indicates juror misconduct, as a juror sought clarification on an issue important to the deliberations.
 {¶ 42} The record indicates that, during deliberations, the jury foreperson informed the trial court that one of the jurors had spoken "to someone on the outside about the case." (Tr. Vol. III, at 549.) The following colloquy then took place between the trial court and the jury foreperson:
 JUROR NO. 1: Juror No. 5 stated that he would like to give his opinion of the case. And before giving any detail or his opinion, said, and I also did some investigation over the weekend and talked to my daughter. And we stopped him there.
 THE COURT: Very good.
 JUROR NO. 1: We didn't want to hear his opinion. We didn't want to hear what he talked about or what his investigation was. But we wanted to report that there was inappropriate action.
 THE COURT: Perfect. Absolutely perfect. We were fearful that somehow or another he had tainted the entire jury with whatever he had learned from the outside.
 JUROR No. 1: No.
 THE COURT: So you stopped him before he had a chance to do that.
 JUROR NO. 1: Yes.
(Tr. Vol. III, at 550.) *Page 15 
 {¶ 43} After this discussion with the jury foreperson, the trial judge spoke individually with "Juror No. 5." The record indicates the following exchange between the trial court and this individual:
 THE COURT: * * * [W]e just talked to the foreman of the jury. Additionally, we received a note from the foreman indicating that you had talked to somebody on the outside and you were about to offer an opinion when you were stopped by the foreman.
 JUROR NO. 5: (Nods head in an affirmative response.)
 THE COURT: How did this happen when you know that I had indicated that you are not to investigate, you are not to talk to anybody? How did this happen?
 JUROR NO. 5: I did not consider this an investigation. I asked my granddaughter if there was any significance of where you sat in an automobile. She indicated there might be. That's what I asked her. That was it.
 THE COURT: That's the sum and substance of the conversation that-
 JUROR NO. 5: That's the sum and substance-
 THE COURT: — of the conversation that you had on the outside world.
 JUROR NO. 5: That's it.
 THE COURT: * * * And what was the opinion you were going to offer?
 JUROR NO. 5: That I was discussing the case and my opinion was that there was significance to the location of Mr. Hayes in the automobile being in the front seat.
(Tr. Vol. III, at 551-552.) *Page 16 
 {¶ 44} In response to further inquiry from the trial court, the juror indicated that his granddaughter was 16 years of age. The trial court then permitted the prosecutor and counsel for appellant to question this juror. In response to a question by counsel for appellant as to why the juror's granddaughter would have any particular knowledge about where an individual would sit, the juror stated: "Just the fact that she's 16 years old and if there was any significance among her friends as to where you would sit in an automobile." (Tr. Vol. III, at 553.) The juror further stated that, based upon his discussion with his granddaughter, "[s]he did not change my feeling." (Tr. Vol. III, at 553.)
 {¶ 45} Following the questioning of this juror, counsel for appellant requested a mistrial. The trial court denied the motion, but indicated it would admonish Juror No. 5 before the jury resumed deliberations. The court then addressed Juror No. 5 regarding any attempt to investigate or obtain additional evidence, and asked this juror to "affirm that in discussing the facts and law with your fellow jurors that you will neither discuss facts not in evidence, nor offer any opinions not your own during the course of deliberations." (Tr. Vol. III, at 571.) The juror responded, "I do, Your Honor." (Tr. Vol. III, at 571.)
 {¶ 46} The trial court also addressed the remaining jurors before they resumed deliberating. The court asked the jurors for assurances that they "will not let this incident interfere with your fair consideration of the facts of this case," and that "you will give the opinion of Juror Five no greater weight nor lesser weight than those of the other jurors." (Tr. Vol. III, at 572.) The court then polled each member of the jury individually, and each juror gave a positive response to the court's inquiry. *Page 17 
 {¶ 47} In Cleveland v. Gonzalez, Cuyahoga App. No. 85070,2005-Ohio-4413, at ¶ 44, the court discussed the standard of review for an appellate court following a trial court's ruling on a motion for mistrial, stating in relevant part:
 The standard of review for evaluating a trial judge's decision to grant or deny a mistrial is abuse of discretion. State v. Sage (1987), 31 Ohio St.3d 173, 182 * * * Mistrials need to be declared only when the ends of justice so require and a fair trial is no longer possible. State v. Franklin (1991), 62 Ohio St.3d 118, 127 * * * This is because the judge is in the best position to determine whether the circumstances of the case necessitate the declaration of a mistrial or whether other corrective actions are sufficient. Quellos v. Quellos (1994), 96 Ohio App.3d 31, 41
* * * A reviewing court may not substitute its judgment for that of the trial court absent an abuse of discretion. Id.
 {¶ 48} Upon review of the record, we find no abuse of discretion by the trial court in denying the motion for mistrial. As reflected above, the trial court, upon hearing from the jury foreperson about a possible impropriety, questioned both the foreperson and Juror No. 5. The jury foreperson indicated that Juror No. 5 had been precluded from telling the other jury members about any outside discussions/investigations. The trial court also allowed counsel for appellant to question Juror No. 5, and the juror indicated that the conversation he had with his 16-year-old granddaughter had not changed his opinion. The trial court admonished Juror No. 5, and also spoke with the other members of the jury, polling each member individually. Further, there was no indication that any of the other jurors were aware of the specific communication between Juror No. 5 and his granddaughter.
 {¶ 49} Under Ohio law, "[a] trial court is permitted to rely on a juror's testimony in determining that juror's impartiality." Haslam v.Russell, Monroe App. No. 03 MO 3, 2003- *Page 18 
Ohio-6724, at ¶ 29, citing State v. Herring (2002), 94 Ohio St.3d 246,259. As noted, none of the other jurors were aware of the conversation at issue, and Juror No. 5 stated that the conversation he had with his granddaughter had not changed his opinion. A reviewing court "should assume, * * * unless an appellant can demonstrate otherwise, that jurors follow their oaths and deliberate only upon the evidence adduced at trial." State v. Villarreal, Butler App. No. CA2004-02-035,2005-Ohio-1924, at ¶ 43. Further, while conversations by a third person with a juror during a trial may invalidate the verdict, where there is nothing in the record to demonstrate that the decision may have been influenced by such a conversation, the refusal of a trial court to grant a new trial will not be disturbed. State v. Steele, Butler App. No. CA2003-11-276, 2005-Ohio-943, at ¶ 82, citing State v. Taylor (1991),73 Ohio App.3d 827, 833.
 {¶ 50} Here, nothing in the record indicates that the juror at issue failed to comply with the trial court's admonition regarding a prohibition from discussing facts not in evidence nor offering the opinion of others during the course of deliberations, and we find no abuse of discretion by the trial court in denying appellant's motion for a mistrial. The second assignment of error is without merit and is overruled.
 {¶ 51} Based upon the foregoing, appellant's first and second assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
 SADLER, P.J., and FRENCH, J., concur. *Page 1